UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INFINITY FLUIDS, CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 12-40004-TSH |
| GENERAL DYNAMICS LAND | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER GRANTING DEFENDANT'S MOTION
## TO COMPEL ARBITRATION AND DISMISS THIS ACTION
June 19, 2013

HILLMAN, District Judge.

On December 29, 2011, Plaintiff Infinity Fluids, Corp. ("Infinity"), a Massachusetts

corporation, filed a ten-count Complaint in Worcester Superior Court against Defendant General

Dynamics Land Systems, Inc. ("GDLS"), a Delaware corporation, alleging misappropriation of

trade secrets and breach of contract (Docket No. 3). Thereafter, on January 20, 2012, GDLS

timely removed the action on diversity of jurisdiction grounds under 28 U.S.C. §§ 1332(a), 1441,

1446 (Docket No. 1).[1] Pending now before this Court is GDLS's Motion to Compel Arbitration

and Dismiss This Action in accordance with the Federal Arbitration Act ("FAA") under 9 U.S.C.

§§ 3-4 (Docket No. 25). After holding a motion hearing on March 22, 2013, the Court took the

present matter under advisement. For the reasons set forth below, I hereby grant GDLS's motion.

---

[1] The Court notes that the proper venue and jurisdiction for this action, at least with respect to the counts arising under the Proprietary Data Agreement, should have been filed in the federal district courts of New York. GDLS, however, did not present a challenge on these grounds in its Answer, thus, such an argument is waived.

Because each of Infinity's claims is arbitrable, I hereby refer this action to arbitration in accordance with the parties' agreements and dismiss the action.

## I.   Background

GDLS is a defense contractor that designs and manufactures various types of armored combat vehicles. In 2008, GDLS began developing the now canceled Expeditionary Fighting Vehicle ("EFV"), an amphibious assault craft designed for use by the United States Marine Corps. Because mission requirements dictated that the EFV maintain the flexibility to operate in harsh weather conditions, specifically, extremely cold environments, GDLS solicited engineering vendors with industry knowledge of component parts that could be incorporated into the final design. One such vendor, Infinity, was tasked with designing a supplementary heating system that could warm the EFV's engine parts prior to cold starts.

On May 8, 2008, GDLS and Infinity agreed to collaborate on the project and signed a Proprietary Data Agreement ("PDA"). Attached as Ex. A to the Declaration of Daniel M. Esrick ("Esrick Decl.") (Docket No. 26-1). The purpose of the PDA was to protect both GDLS and Infinity's confidential proprietary information and facilitate an exchange of ideas during the project. PDA ¶ 1. In February 2009, GDLS acted on Infinity's preliminary proposals and submitted a Purchase Order ("PO") for several heater assemblies. Although GDLS and Infinity continued to work for nearly two years to develop a heating system, GDLS eventually found a different vendor whose designs they believed were better suited for the EFV. Infinity alleges that they were the only company in the marketplace with the knowledge and expertise to design and manufacture such heating systems, thus, the only way other vendors could have bid on the project was if GDLS had disclosed Infinity's proprietary information to them.

Seven of Infinity's ten claims arise from GDLS's alleged misappropriation of Infinity's trade secrets: Count One (Misappropriation and Misuse of Trade Secret Information under G.L. ch. 93A, § 42), Count Two (Misappropriation of Confidential Information), Count Three (Unfair Competition under G.L. ch. 93A, § 11), Count Four (Negligent Misrepresentation under G.L. ch. 93A, § 11), Count Five (Negligent Misrepresentation), Count Nine (Fraudulent Misrepresentation under G.L. ch. 93A, § 11) and Count Ten (Fraud and Deceit). Infinity's final three claims seek redress based on breach of contract theories: Count Six (Breach of Contract), Count Seven (Unjust Enrichment under G.L. ch. 93A, § 11) and Count Eight (Unjust Enrichment).

## II. Relevant Documents

### a. The PDA

The disposition of the present motion depends upon whether or not the arbitration language contained within the PDA is valid and enforceable. Several sections of the PDA are relevant to this issue. For example, under Paragraph 3, the parties agreed:

> (i) to use the other's Proprietary Information solely for the purposes of the Program; (ii) not to disclose or reveal to any third-party, without the disclosing party's prior written consent, any portion of the disclosing party's Proprietary Information or any notes, summaries or other information derived from the Proprietary Information; (iii) to disclose Proprietary Information of the disclosing party or portions thereof only to those employees, contract employees, or other agents or representatives of the receiving party who need to know such information for the purposes of the Program, and who are under an obligation to hold such information in confidence under terms and conditions at least as restrictive as the terms and conditions of this Agreement; and (iv) not to use any portion of the disclosing party's Proprietary Information for personal gain or to advance or support the receiving party's other business ventures or the business ventures of others.

PDA ¶ 3. "Proprietary Information," under Paragraph 1, "includes all information, in whatever form or medium previously provided or provided in connection with this Agreement which is

identified as proprietary by the disclosing party." *Id.* ¶ 1. Under Paragraph 8, "nothing contained in this agreement shall be construed as granting . . . any right, title, ownership, . . . , in . . . either Party's . . . , trade secrets, . . . , or other intellectual property or property rights. All intellectual property and proprietary rights in the Propriety Information will remain at all times the property of the disclosing party." *Id.* ¶ 8. Finally, under Paragraph 15, "[a]ll disputes arising from or relating to this Agreement, with the sole exception of disputes *regarding the creation or ownership* of any and all intellectual property, shall be irrevocably submitted to arbitration. *Id.* ¶ 15 (emphasis added).

### b.  The PO

The PO also contained an arbitration provision that incorporated by reference separate Terms and Conditions that could only be accessed through GDLS's corporate website. Attached as Ex. C to the Esrick Decl. (Docket No. 26-2). In the text on the PO's first page, the Terms and Conditions are referenced in a link ("www.gdls.com/procurement/html") which was inoperable in 2009. Attached as Ex. 1 to Plaintiff's Motion in Opposition (Docket No. 27-1). However, on the lower left-hand side of every page of the PO is a text box with the header "Terms and Conditions" which states: "Please refer to the General Dynamics Land Systems website at www.gdls.com for purchase order terms and conditions." The arbitration provision contained in the Terms and Conditions states in relevant part:

> Any and all claims, disputes or other matters in question arising out of, or relating to, this Contract or the breach thereof shall be decided by arbitration in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association (the "AAA Rules").

Terms and Conditions ¶ 30.

### III.  Legal Standards

4

At its most basic level, the FAA is a "congressional declaration of [the] liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927 (1983). Agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Moreover, the FAA "ensure[s] judicial enforcement of privately made agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219, 105 S. Ct. 1238 (1985), and "place[s] such agreements upon the same footing as [any] other contract[]." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 271, 115 S. Ct. 834 (1995). *See also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 405, 87 S. Ct. 1801 (1967) ("[I]t is clear beyond dispute that the [FAA] is based upon and confined to the incontestable federal foundations of control over interstate commerce and over admiralty.") (internal quotations and citations omitted); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Doubts should be resolved in favor of coverage*.") (emphasis added).

When a party seeks either to compel arbitration under Section 4 or to stay proceedings under Section 3, they must satisfy four requirements: "[1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003); 9 U.S.C. §§ 3-4. If a district court finds that each claim presented in a complaint is arbitrable, it remains within that court's discretion to

dismiss the action. *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 372 (1st Cir. 2011).

### IV.  Discussion

In opposition to GDLS's motion, Infinity presents two basic arguments for why the application of either arbitration provision would be inappropriate: 1) Infinity was not notified of the arbitration provision under Paragraph 30 of the PO's Terms and Conditions; and 2) Infinity's misappropriation claims fall within the PDA's express carve-out under Paragraph 15 and are exempted from arbitration. Because nothing in the record shows that the first, second and third elements of an arbitrable claim are in dispute, the Court narrows its focus to the fourth element of whether Infinity's claims fall within the scope of the arbitration language set forth in either the PDA or the PO's Terms and Conditions.

#### a.  Breach of Contract

Before delving into Infinity's breach of contract arguments, the Court notes that much of this dispute stems from the fact that when asked during discovery to support its argument in favor of arbitration, GDLS attached a 2012 version of the Terms and Conditions rather than a 2009 version from the time of the PO's execution. While the Court finds objectionable GDLS's response to Infinity's inquiry only one day prior to filing the present motion, nevertheless, during the hearing GDLS presented sufficient evidence demonstrating that neither the Terms and Conditions as a whole nor the specific arbitration provision under Paragraph 30 had materially changed from 2009. Notwithstanding the foregoing, Infinity argues that it lacked notice of the Terms and Conditions for two primary reasons.

First, Infinity argues that because GDLS allegedly canceled the PO in 2009, "thus invalidating the agreement," that GDLS cannot, in turn, rely upon the PO's Terms and

Conditions to support its contention that any disputes arising thereunder should be arbitrated in accordance with Paragraph 30. *See* Plaintiff's Opposition to Defendant's Motion to Compel Arbitration and Motion to Dismiss, at 4 n.5 (Docket No. 27). However, a party's decision to rescind a contract does not have "the automatic effect of voiding [that] contract" and any arbitration language contained therein. *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 54 (1st Cir. 2002). Further, Infinity glosses over the fact that its own breach of contract claims arising under the PO are clearly that: claims to enforce *the contract*. Thus, Infinity attempts to argue both sides of this issue by alleging that the PO is valid with respect to the provisions that Infinity deems GDLS to have breached, while denying the PO's validity when GDLS raises a contractual defense thereto.

Second, Infinity argues that referring its claims to arbitration would be unconscionable because GDLS attempted to incorporate the PO's Terms and Conditions through an inoperable website link, therefore, Infinity could not have known or assented to the arbitration terms. "Incorporation by reference is a common tool in the drafting of contracts." *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 7 (1st Cir. 2011). "When a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument." 11 Williston on Contracts § 30:25 (4th ed. 2013). "Internal references in one document to another are often helpful in the processes of interpretation and adjudication, but the absence of such a reference does not make a document unusable in these processes or inadmissible in evidence." *Senior v. NSTAR Elec. & Gas Corp.*, 449 F.3d 206, 219 (1st Cir. 2006) (internal quotations and citations omitted). "That the [Terms and Conditions] were not themselves included with the [PO] does not render the arbitration

provisions invalid." *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 97 (2d Cir. 2002).

Here, the Court agrees with Infinity that the link "www.gdls.com/procurement/html" located in the text of the PO's first page was likely inoperable in 2009. Had this link been the only reference to the Terms and Conditions, GDLS would have failed to provide Infinity with adequate notice of the arbitration language contained therein. However, what should have been clear to a sophisticated party like Infinity is the fact that a separate and conspicuous text box *contained on every page of the PO* clearly and unequivocally states that the Terms and Conditions can be found at "www.gdls.com," which was operable in 2009. The Court finds that this explicit and recurring language sufficiently provided Infinity with notice of where to locate the Terms and Conditions and the arbitration language contained in Paragraph 30. *See, e.g.*, *Hubbert v. Dell Corp.*, 359 Ill. App. Ct. 976, 984, 835 N.E.2d 113 (2005) (holding that within the "browsewrap" context a computer seller's use of a blue hyperlink to incorporate "Terms and Conditions of Sale" was conspicuous and provided notice to the buyer because the link was included on numerous pages which acted like a "multipage written paper contract").

Accordingly, and for the reasons stated above, any breach of contract dispute arising under the PO shall be referred to arbitration in accordance with Paragraph 30 of the Terms and Conditions.

### b.  Misappropriation

Infinity argues that its misappropriation claims should not be referred to arbitration because they fall within the explicit carve-out under Paragraph 15 of the PDA that creates an "exception [for] disputes regarding the creation or ownership of any and all intellectual property." PDA ¶ 15. During the motion hearing, Infinity admitted that the PDA protected the

8

parties' existing trade secret information the moment the PDA was executed. *See id.* ¶ 8 ("All intellectual property and proprietary rights in the Proprietary Information will remain at all times the property of the disclosing party."). Infinity also acknowledged that the PDA was designed to "protect the confidentiality of certain Proprietary Information" disclosed between the parties. Moreover, all of the proprietary information that Infinity disclosed to GDLS during their relationship was directly related to the EFV project.

GDLS reads the "creation or ownership" provision as exempting from arbitration disputes over "who owns what" intellectual property disclosed during the parties' relationship governed by the PDA. Infinity, however, contends that this provision implicitly includes a temporal component by arguing that its misappropriation claims arise not from those trade secrets existing *ex-ante* the PDA, but rather relate to the "creation or ownership" of *new* intellectual property created *ex-post* the PDA. Albeit intriguing, this argument is misplaced for several reasons.

First, Infinity presented no evidence either in its pleadings or during the hearing to demonstrate that while cooperating with GDLS it developed new trade secrets separate and distinct from its trade secrets already in existence. The Complaint is vague and never mentions the creation of "new" intellectual property in any of the misappropriation counts.[2] Even assuming, *arguendo*, that Infinity did create new trade secrets, it is well-settled within intellectual property law that purported owners of trade secrets must use reasonable efforts to maintain the secrecy of such information. Here, however, the only evidence demonstrating that Infinity made an effort to protect its trade secrets was signing the PDA, which according to Infinity should not apply. *Cf.* Compl. ¶¶ 66, 73. Thus, Infinity's characterization of this dispute

---

[2] Each of the seven misappropriation counts generally relates to GDLS either "disclosing" or "sharing" Infinity's proprietary information with third parties. Compl. ¶¶ 65, 72, 76, 80, 85, 106, 114.

as one involving trade secrets created ex-post the PDA while providing no evidence that it even created or protected such "new" trade secrets does not follow logically.

Second, and more importantly, Infinity misinterprets several key provisions under the PDA in light of its claims for misappropriation. To reiterate, but for an exception to arbitration, all other disputes that may arise under the PDA are expressly arbitrated under Paragraph 15. Under Paragraph 1, "Proprietary Information" includes information that is "*provided in connection with this Agreement* [and] which is identified as proprietary by the disclosing party." PDA ¶ 1. Under Paragraph 3, GDLS and Infinity are expressly prohibited from "disclos[ing] or reveal[ing]" proprietary information to third parties. *Id.* ¶ 3. Thus, any proprietary information that either party discloses to one another remains protected, regardless of when it was created and so long as it was disclosed in connection to the EFV project. Therein lies the logical conundrum with Infinity's position. Assuming Infinity disclosed "new" trade secrets to GDLS that were for the purpose of and "in connection" to the EFV project, how then would that same information not be protected under the PDA and implicate the arbitration provision under Paragraph 15? It is clear that Infinity's claims implicitly allege material breaches of Paragraphs 1 and 3 and should be remedied under Paragraph 15 which states that "[a]ll disputes arising from or relating to this Agreement . . . shall be irrevocably submitted to arbitration." *Id.* ¶ 15.

Accordingly, and for the above stated reasons, any disputes for misappropriation of trade secrets arising under the PDA shall be referred to arbitration in accordance with Paragraph 15.

## V.   Conclusion

For the above stated reasons, GDLS's Motion to Compel Arbitration and Dismiss This Action is GRANTED. Because each count of the Complaint is arbitrable under either the PDA or the PO, this case is hereby DISMISSED in its entirety.

It is so ORDERED.

/s/ Timothy S. Hillman
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE